# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JOSHUA VOSS, by and through his Guardian Ad Litem, Teresa Voss,<br><br>　　　　　　　　Plaintiff,<br>vs.<br>UNITED STATES OF AMERICA, XDI ULTRASOUND, INC., FRANK D. HAMLETT, M.D., and DOES 1 through 20, inclusive,<br><br>　　　　　　　　Defendants. | CASE NO. 05cv0335 BTM(BLM)<br><br>**ORDER GRANTING DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT** |

Defendants United States of America, XDI Ultrasound, Inc. ("XDI"), and Frank D. Hamlett, M.D., have filed motions for summary judgment. For the reasons discussed below, Defendants' motions for summary judgment are **GRANTED**.

## I. FACTS

For many years, John and Teresa Voss tried unsuccessfully to conceive a child. (John Voss Depo. (United States' Exh. 3), 8:8-14.) In late 2001, Mrs. Voss discovered that she was pregnant with "our little miracle surprise." (Teresa Voss Depo. (United States' Exh. 1), 16:18-25, 17:9-11.)

Mrs. Voss received prenatal care at the Balboa Naval Medical Center ("NMCSD"). (Teresa Voss Depo. (United States' Exh. 1), 20:24-25.) Her obstetrician/gynecologist at

NMCSD was Christopher Tatro, M.D.  At approximately 15 weeks into her pregnancy, Mrs. Voss underwent a maternal "triple screen" blood test which assesses levels or risk for certain types of anomalies including Down's syndrome. (Tatro Depo. (United States' Exh. 4), 33:14-34:2.)  The test results were negative. (Downscreen Plus Report (United States' Exh. 5).)

During Mrs. Voss's 19th week of pregnancy, Dr. Tatro ordered a "Level II" ultrasound. The ultrasound was performed by a sonographer and was interpreted by radiologist Robert Fleck, M.D. (Radiologic Examination Report (United States' Exh. 7).)  In his report, Dr. Fleck noted, "no fetal anomalies." (Id.)

During her 28th week of pregnancy, Mrs. Voss elected to undergo another ultrasound study at XDI, a private facility.  The ultrasound images were interpreted by Frank B. Hamlett, M.D., who reported: "The following fetal anatomical structures were visualized and appeared normal: 4 chamber heart, cerebellum, lateral ventricles, spine, extremities, kidneys, bladder, stomach, and 3 vessel cord with normal cord insertion." (Interpretation of Radiographic Examination (United States' Exh. 9.).)  The report was sent to Dr. Tatro. (Tatro Depo. (XDI Exh. 6), 79:13-15.)

On July 4, 2002, at 38 ½ weeks, Mrs. Voss went into labor and went to NMCSD. During labor, fetal heart monitoring indicated that the baby was experiencing fetal heart decelarations, a potential sign of fetal distress. (Triage Assessment Report (United States' Exh. 10).)  As a result, it was recommended that Mrs. Voss undergo an emergency Cesarean section ("C-section"). (Id.)  Forms indicate that Mr. and Mrs. Voss gave verbal consent to the C-section. (Consent Form (United States' Exh. 11).)

Joshua was born via C-section weighing 7 pounds and 1 ounce. (NMCSD Delivery Data (United States' Exh. 14).)  The only treatment he received upon birth was blow-by oxygen in addition to stimulation. (Id.)

Shortly after birth, Joshua was diagnosed with Down's Syndrome. (John Voss Depo. (United States' Exh. 3), 63:10-12.)  Richard Jensen, M.D., the pediatric cardiologist on call, was contacted to evaluate Joshua because Joshua had a heart murmur and children with Down's syndrome have a high risk of congenital heart disease. (Jensen Depo. (United

States' Exh. 15), 16:11-15.) About three hours after Joshua's birth, Dr. Jensen performed an echocardiogram (a term used interchangeably with ultrasound) which revealed that Joshua had congenital heart defects including complex atrial ventricular septal defect and pulmonary atresia. (Jensen Report (United States' Exh. 16).)  Dr. Jensen started Joshua on a low-dose Prostaglandin E ("PGE") infusion. (Id.)

Dr. Jensen and other cardiologists and surgeons at Children's Hospital agreed that a heart catheterization was necessary to determine Joshua's medical options because the echocardiogram did not provide information regarding the size of the branch pulmonary arteries and whether there were additional branches. (Jensen Depo., 37:17-38:21, 66:20-67:7; Pelletier Depo. (United States' Exh. 19), 25:7-12.) The catheterization was performed when Joshua was six days old.

After the catheterization, Joshua's case was presented to a conference of cardiologists, surgeons, and other caregivers, and it was determined that the plan that would be in Joshua's best interest was to undergo surgery. (Pelletier Depo., 22:20-23:2.) Dr. Pelletier, Joshua's cardiac surgeon, met with the Vosses and explained to them the nature of Joshua's heart problem, the multiple surgeries that he would probably have to undergo, the risks of the surgical procedures, possible complications, and his reduced life expectancy as a result of his Down's syndrome in combination with his congenital heart disease. (Pelletier Depo., 41:21-42:7, 80:21-82.) Dr. Pelletier also advised the Vosses that they could decide to forgo the surgery. (Pelletier Depo., 51:5-10.)

The Vosses elected to go forward with surgery. On July 17, 2002, Joshua had a shunt placed in his heart. On October 8, 2002, Joshua had his first reparative heart surgery. Since then Joshua has undergone a number of other surgical procedures. Joshua's pediatric cardiologist opines that Joshua is "stable and doing well from a cardiac standpoint." (United States' Exh. 20.)

## II. PROCEDURAL HISTORY

On October 3, 2003, Mr. and Mrs. Voss and Joshua Voss (through a Guardian Ad

1  Litem) filed a complaint for wrongful life and wrongful birth in San Diego Superior Court.  The
2  complaint named as defendants XDI and Dr. Hamlett only.  On May 12, 2004, XDI and Dr.
3  Hamlett filed demurrers which were denied by the court.  On June 3, 2005, the plaintiffs
4  requested and received a voluntary dismissal of the entire state court action.
5  On February 18, 2005, Mrs. Voss and Joshua Voss (through Guardian Ad Litem Mr.
6  Voss) commenced this action, asserting claims for wrongful birth and wrongful life.  On June
7  3, 2005, Mrs. Voss voluntarily dismissed her wrongful birth claims.  On September 21, 2005,
8  the Court granted a petition to substitute Mrs. Voss as Guardian Ad Litem for Joshua.

### III. STANDARD

Summary judgment is appropriate under Rule 56 of the Federal Rules of Civil Procedure if the moving party demonstrates the absence of a genuine issue of material fact and entitlement to judgment as a matter of law.  Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).  A fact is material when, under the governing substantive law, it could affect the outcome of the case.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); Freeman v. Arpaio, 125 F.3d 732, 735 (9th Cir. 1997).  A dispute is genuine if a reasonable jury could return a verdict for the nonmoving party.  Anderson, 477 U.S. at 248.

A party seeking summary judgment always bears the initial burden of establishing the absence of a genuine issue of material fact.  Celotex, 477 U.S. at 323.  The moving party can satisfy this burden in two ways: (1) by presenting evidence that negates an essential element of the nonmoving party's case; or (2) by demonstrating that the nonmoving party failed to establish an essential element of the nonmoving party's case on which the nonmoving party bears the burden of proving at trial.  Id. at 322-23.  "Disputes over irrelevant or unnecessary facts will not preclude a grant of summary judgment."  T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n, 809 F.2d 626, 630 (9th Cir. 1987).

Once the moving party establishes the absence of genuine issues of material fact, the burden shifts to the nonmoving party to set forth facts showing that a genuine issue of disputed fact remains.  Celotex, 477 U.S. at 314.  The nonmoving party cannot oppose a

properly supported summary judgment motion by "rest[ing] on mere allegations or denials of his pleadings." Anderson, 477 U.S. at 256. When ruling on a summary judgment motion, the court must view all inferences drawn from the underlying facts in the light most favorable to the nonmoving party. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).

## IV. DISCUSSION

A. Wrongful Life Liability

Plaintiff does not argue that if his parents had known about his heart defects and Down's syndrome they would have terminated the pregnancy. Indeed, the Vosses believe that abortion is murder and would not have terminated the pregnancy under any circumstances. (Teresa Voss Depo., 34:6-12; John Voss Depo., 37:22-38:7, 40:18-41:2.) Joshua's wrongful life claim rests on the theory that if his conditions had been diagnosed prior to birth (1) his mother would not have consented to the C-section and would have continued with a vaginal, stillbirth delivery; and (2) his parents would not have consented to any life-saving measures taken after birth to keep him alive.

Defendants argue that Joshua's wrongful life claim fails as a matter of law because, under California law, wrongful life liability is limited to situations where the mother would not have conceived the child in the first place or would have had an abortion. The Court finds Defendants' argument persuasive.

California is one of the few jurisdictions that recognizes the cause of action for wrongful life. A claim for wrongful life is a claim for professional malpractice based on negligent genetic counseling and testing. Turpin v. Sortini, 31 Cal. 3d 220, 229 (1982); Gami v. Mullikin Med. Center, 18 Cal. App. 4th 870, 883 (1993). The alleged harm to the plaintiff child is that the child was born with an impairment (as opposed to not being born at all). Turpin, 31 Cal. 3d at 231.

Although the focus of a wrongful life claim is on the birth of the afflicted child, the claim implicates the reproductive rights of the mother. The premise of the claim is that if the

parents had been informed of the genetic defect, the mother would have exercised her right not to conceive or to have an abortion as permitted by law. See Gami, 18 Cal. App. 4th at 883 (explaining that pre-conception genetic counseling provides patients with information pertaining to whether or not they should conceive and that post-conception genetic counseling allows a mother to make an informed decision as to whether to have a eugenic abortion of a deformed or otherwise genetically defective fetus).

In Curlender v. Bio-Science Laboratories, 106 Cal. App. 3d 811 (1980), the first California case to recognize the wrongful life cause of action, the court noted that many other courts had refused to allow wrongful life claims for public policy reasons, including the "deeply held belief in the sanctity of life." Id. at 826. The Curlender court countered the "sanctity of life" argument by pointing to the "monumental implications of Roe v. Wade . . . one of which is the present legality of, and availability of, eugenic abortion in the proper case." Id. The court explained that Roe v. Wade was "of considerable importance in defining the parameters of 'wrongful-life' litigation." Id. at 819.

There are no California cases that speak to whether a plaintiff can recover for wrongful life based on his parents being deprived of the opportunity to allow him to die *after the point of viability*. However, there are strong public policy reasons why California courts would not extend the tort to such situations.

As explained in Planned Parenthood of Southeastern Pennsylvania v. Casey, 505 U.S.833, 870 (1992), after the point of viability, "the independent existence of the second life can in reason and all fairness be the object of state protection that now overrides the rights of the woman." In other words, "it might be said that a woman who fails to act before viability has consented to the State's intervention on behalf of the developing child." Id. Thus, after the point of viability, state laws and questions of medical ethics complicate the matter of when and under what circumstances a woman can choose to allow a viable fetus to die instead of submitting to medical intervention (whether it be undergoing a C-section, taking antibiotics, or submitting to some other medical procedure).

In addition, allowing a wrongful life claim in a case such as this one would expose

health care professionals to liability at every turn.  On one hand, if the doctor does not tell the parents that the baby will die if medical treatment or surgery is withheld, the parents can later bring a wrongful life suit and argue that the baby would not have survived absent medical intervention.  On the other hand, if the doctor tells the parents that the baby will die if medical intervention is withheld and the baby survives but suffers brain damage or some other impairment as a result of not receiving the medical attention, the parents can sue for medical malpractice.

Furthermore, Plaintiff's theory of liability endorses the deliberate withholding of medical treatment as a method of ending the life of an unborn baby.  Unlike abortion, however, this method does not always result in the death of the baby.   Such inaction can cause serious and lasting harm to the surviving child: in addition to his or her preexisting impairments, the child may be forced to suffer neurological injury caused by the withholding of medical treatment and perhaps the burden of knowing that his parents attempted to end his or her life.

California courts have demonstrated "a manifest and unequivocal understanding of the utmost importance of public policy considerations in reaching a just result." Curlender, 106 Cal. App. 3d at 828.  Thus, the Court doubts that the California Supreme Court would extend the scope of wrongful life claims to cases where parents claim that had they received a proper pre-natal diagnosis, they would have declined a C-section or other medical intervention and would have allowed their viable fetus to expire.  Absent a California Supreme Court case extending the scope of wrongful life liability as urged by Plaintiff, this Court declines to do so.[1]

---

[1] In the state court case, XDI and Dr. Hamlett demurred to the Second Amended Complaint on the ground that the Vosses had not alleged that Mrs. Voss would have had an abortion had she been informed of the fetus's abnormalities. In a one page order, the state court denied the demurrers and ruled that the Vosses had stated a negligence cause of action. (Pl.'s Exh. 1.) This Court is not bound by the state court's decision. See Vestar Dev. II, LLC v. General Dynamics Corp., 249 F.3d 958, 960 (9th Cir. 2001) (explaining that when interpreting state law, federal courts are bound by decisions of the state's highest court). Furthermore, issue preclusion does not apply here because there was no final judgment on the merits in the state case. See San Remo Hotel L.P. v. San Francisco City and County, 364 F.3d 1088, 1096 (9th Cir. 2004).

B. <u>Causation</u>

Even if California law permitted a wrongful life claim on the theory advanced by Plaintiff, Plaintiff's claim fails because Plaintiff has not raised a triable issue of material fact as to the element of causation.

Plaintiffs in a wrongful life case must establish "(1) the duty of the professional to use such skill, prudence, and diligence as other members of his profession commonly possess and exercise; (2) a breach of that duty; (3) a proximate causal connection between the negligent conduct and resulting injury; and (4) actual loss or damage resulting from the professional's negligence." <u>Simmons v. West Covina Medical Clinic</u>, 212 Cal. App. 3d 696, 702 (1989) (quoting <u>Budd v. Nixen</u>, 6 Cal. 3d 195, 200 (1971)).  A plaintiff must establish causation based on "reasonable medical probability."  <u>Simmons</u>, 212 Cal. App. 3d at 702. A mere possibility that the defendant's negligence caused the wrong is not sufficient to support recovery.  <u>Id.</u>

Here, Plaintiff has failed to establish a causal connection between Defendants' alleged negligence and his birth.  Even assuming, as Plaintiff claims, he would not have survived a vaginal delivery, Plaintiff has not provided sufficient evidence that if his parents had been advised that he suffered from heart problems and Down's Syndrome, they would have foregone the C-section to allow him to die.

In support of Plaintiff's opposition, Plaintiff submits the declaration of Mrs. Voss in which Mrs. Voss declares: "If, before my admission to the hospital on July 4, 2002, I was informed of the nature and extent of my child's cardiac defect, prognosis, and future medical needs, I would have declined the emergency Cesarean section delivery."  However, this declaration is premised on unsupported assumptions.

At most, an ultrasound would have detected Joshua's primary diagnosis.  Even Plaintiff's expert, Dr. Marshall concedes that the ultrasounds would not necessarily allow for a precise final diagnosis. (Marshall Depo. (Pl.'s Exh. 4), 98:24-99:2.)  By all accounts, the post-birth catheterization was necessary to determine the extent of Joshua's pulmonary artery abnormalities and whether there were collateral vessels.  (Waldman Report at 2;

Jensen Depo., 37:21-38:21; Pelletier Depo., 23:18-25:4; Wong Decl., ¶¶ 7-8; Blake Decl., ¶ 5.) Without the catheterization, it would not be possible to formulate a surgical course or provide an accurate prognosis. (Id.)

Furthermore, although Plaintiff's expert opines that "it is almost certain that the newborn would have been stillborn" if Mrs. Voss refused the C-section and had a vaginal delivery (Pl.'s Exh. 5 at 6), there is no evidence that *Mrs. Voss's doctors would have advised her that this was the case*. Indeed, Defendants' experts opine that Joshua would have likely survived a vaginal delivery but would have been at increased risk of neurologic damage. (Blake Decl., ¶¶ 8-10; Sims Decl., ¶ 10; Porto Report).

Dr. Blake explains: "No physician acting within the standard of care could assure the Vosses that the refusal of a Cesarean section would have resulted in Joshua's death in utero. What a physician acting within the standard of care could assure the Vosses of is that the failure to do a Cesarean section carried the risk of causing their child to sustain fetal hypoxia and brain damage." (Blake Decl., ¶ 10.) Even Plaintiff's expert concedes that no obstetrician acting within the standard of care could guarantee that Mrs. Voss's refusal of a C-section would cause Joshua to die. (Marshall Depo. (XDI Exh. 12), 191:16-20.)

There is no evidence that Mrs. Voss would have refused to have the C-section under the following conditions: (1) an absence of information regarding the precise extent of Joshua's heart abnormalities, the recommended surgical course, and his prognosis; (2) no guarantee that Joshua would die during the course of a vaginal delivery; and (3) a disclaimer that if Joshua survived the vaginal delivery, he could suffer brain damage from lack of oxygen. Therefore, Plaintiff has failed to establish that Defendants' alleged negligence caused him to be born.

In his First Amended Complaint, Plaintiff also bases his wrongful life claim on "medical intervention" after his birth. However, Plaintiff has not produced any evidence of life-saving measures taken after his birth and before the Vosses gave consent to his initial heart surgery. Upon birth, Plaintiff was given some "blow-by" oxygen but did not require resuscitation or any life-saving measures. (United States' Exh. 14.) He was born with

normal APGAR scores of 8/9.  (Blake Decl., ¶ 2.)

Plaintiff was also started on PGE.  However, Drs. Jensen and Pelletier believe that Joshua would have survived without the administration of the PGE.  (Jensen Depo., 41:22-42:5.)  Dr. Pelletier explains that in retrospect, the PGE may not have provided a significant benefit to Joshua.  (Pelletier Depo., 46:9-49:11.)

PGE is primarily administered to maintain patency of the ductus arteriosus to help support circulation to the lungs or the body.  (Id.)  However, in Plaintiff's case, it turned out that he did not have a true ductus arteriosus.  (Id.)  Although PGE helps dilate some of the arteries in the lungs, without a true ductus arteriosus, the PGE likely would not have much benefit.  (Id.; Waldman Report at 3.)

Plaintiff does not counter Defendants' evidence with evidence that he would have died without the PGE.  Plaintiff also fails to establish that his doctors took any other life-saving measures prior to his surgery.

Plaintiff has failed to raise a triable issue of material fact with respect to the element of causation.  There is no evidence supporting a right to recover damages.  Accordingly, the Court grants summary judgment in favor of Defendants.  In doing so, the Court does not minimize the tragic nature of this case or the hardships continued to be suffered by the Vosses.

## V. CONCLUSION

For the reasons discussed above, Defendants' motions for summary judgment **[37-1;45-1; 57-1]** are **GRANTED**.  The Clerk shall enter final judgment in favor of Defendants and against Plaintiff.

**IT IS SO ORDERED.**

DATED: September 18, 2006

*Barry Ted Moskowitz*

Hon. Barry Ted Moskowitz
United States District Judge